# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        **Plaintiff,**

v.                               **Case No: 6:19-cv-1843-RBD-LRH**

ANDRES FERNANDEZ and EDISON
DENIZARD,

        **Defendants.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

      This cause came on for consideration without oral argument on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **PLAINTIFF'S RENEWED MOTION FOR FINAL DEFAULT JUDGMENT AGAINST DEFENDANT ANDRES FERNANDEZ (Doc. No. 39)** |
| **FILED:** | **March 8, 2021** |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

## I.    BACKGROUND.

      On September 25, 2019, Plaintiff, the Securities and Exchange Commission ("SEC"), filed a complaint against Defendants Andres Fernandez ("Fernandez") and Edison Denizard ("Denizard"). Doc. No. 1. The SEC alleges that from 2015 through 2017, Defendants, through companies they controlled, raised millions of dollars from numerous investors in unregistered fraudulent securities offerings. _Id._ ¶¶ 1–2. The complaint contains the following claims for relief:

(1) Count 1 – Violation of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & 77e(c);

(2) Counts 2 through 4 – Violations of Sections 17(a)(1)–(3) of the Securities Act, 15 U.S.C. § 77q(a)(1)–(3); (3) Counts 5 through 7 –   Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)–(c) promulgated thereunder, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5.   *Id.* at 8–11.   The SEC seeks a permanent injunction enjoining Defendants and their agents from violating these provisions of the Securities Act and Exchange Act; disgorgement of Defendants' ill-gotten gains, to include prejudgment interest; and a civil monetary penalty against Defendants.   *Id.* at 12.

As relevant to the above-styled motion, the SEC filed a return of service stating that Fernandez was served with a copy of the summons and complaint on October 8, 2019, by leaving a copy with "Jose Castano as co-resident/Father-in-law" of Fernandez at "6510 Lake Pembroke Pl, Orlando, FL 32829."  Doc. No. 11-1.  Fernandez did not respond to the complaint, and Clerk's default was therefore entered against him on November 1, 2019.   Doc. No. 13.[1]

On November 6, 2019, the SEC filed a motion for default judgment against Fernandez. Doc. No. 14.   The undersigned denied that motion without prejudice due to the risk of inconsistent judgments because the case was still proceeding as to Fernandez's co-defendant, Denizard.   Doc. No. 17.   The undersigned further stated that a renewed motion for default judgment against Fernandez could be filed after the case was resolved against Denizard.   *Id.* at 3.

On October 26, 2020, the SEC notified the Court that the SEC reached a settlement with Denizard on the non-monetary relief sought in the complaint.  Doc. No. 30.   With respect to

---

[1] It appears that Mr. Fernandez is currently incarcerated in connection with parallel criminal proceedings, discussed herein.  *See United States v. Fernandez*, No. 6:19-cr-00008-GAP-GJK-1, Doc. No. 116 (M.D. Fla. September 25, 2020).   However, service in this case pre-dated his incarceration.  *See* Doc. No. 11-1.   Upon review, service, and therefore Clerk's default, appear proper.  *See* Fed. R. Civ. P. 4(e)(2)(B).

monetary relief, the SEC requested that the Court stay the remainder of the case until resolution of a parallel criminal proceeding against Denizard (*i.e.*, determination of the amount of disgorgement, prejudgment interest, and civil penalty).   *Id.   See United States v. Denizard*, No. 6:20-cr-135-PGB-EJK.   The Court has since granted the request for a stay and entered a permanent injunction against Denizard upon his consent.   Doc. No. 35.

On October 26, 2020, the SEC renewed its motion for default judgment against Fernandez, based on its resolution of the matter with regard to Denizard.   Doc. No. 31.   With the motion, the SEC also filed a Notice of Voluntary Dismissal with Prejudice of its Claim for Civil Penalty Against Defendant Andres Fernandez.   Doc. No. 32.   The undersigned denied the renewed motion for default judgment without prejudice because the SEC had not sufficiently supported its request for an order that Fernandez pay $1,650,000 in disgorgement as outlined in the motion, and because the SEC had not adequately explained its attempt to abandon its civil penalty claim against Fernandez. Doc. No. 37.   Accordingly, the undersigned permitted the SEC through March 8, 2021 to file a renewed motion addressing these issues.   *Id.* at 6.

On March 8, 2021, the SEC filed a renewed motion for default judgment against Fernandez, in which it seeks a permanent injunction against Fernandez, as well as an order against Fernandez for $1,627,700 in disgorgement and $192,596.28 in prejudgment interest, to be offset by a criminal restitution order.   Doc. No. 39.   The SEC again seeks dismissal of its claim for a civil penalty.   *Id.* at 20–21.   With the motion, the SEC has included (1) the declaration of Lina Fernandez as to the calculation of disgorgement (Doc. No. 39-1); an affidavit regarding Fernandez's military status (Doc. No. 39-2); (3) an affidavit regarding Fernandez's age and competency (Doc. No. 39-3); (4) a prejudgment interest report (Doc. No. 39-4); (5) a copy of the judgment from parallel criminal proceedings against Fernandez, *United States v. Fernandez*, No. 6:19-cr-00008-GAP-GJK-1, Doc.

No. 60 (M.D. Fla. Jan. 14, 2020) (Doc. No. 39-5); and (6) a proposed order on the SEC's motion (Doc. No. 39-6).   The motion indicates that it was served on Fernandez at his place of incarceration, Doc. No. 39, at 23, but Fernandez has not responded to the motion, and the time for doing so has expired.   *See* Local Rule 3.01(c).

The SEC also requested that this case be stayed pending resolution of the renewed motion. Doc. No. 40.   The Court has since granted that request, and ordered that the case is stayed as to Fernandez, pending resolution of the renewed motion for default judgment.   Doc. No. 41.   The renewed motion for default judgment has been referred to the undersigned for issuance of a Report and Recommendation, and the matter is ripe for review.

## II.   STANDARD OF REVIEW.

A court may enter a default judgment only if the factual allegations of the complaint, which are assumed to be true, provide a sufficient legal basis for such entry.   *See Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.").[2]   Therefore, in considering a motion for default judgment, a court must "examine the sufficiency of plaintiff's allegations to determine whether plaintiff is entitled to" a default judgment.   *Fid. & Deposit Co. of Md. v. Williams*, 699 F. Supp. 897, 899 (N.D. Ga. 1988).

The Supreme Court has explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.   A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

---

[2] The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981.   *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   This analysis applies equally to motions for default judgment.   *De Lotta v. Dezenzo's Italian Rest., Inc.*, No. 6:08-cv-2033-Orl-22KRS, 2009 WL 4349806, at *5 (M.D. Fla. Nov. 24, 2009) (citations omitted).

If the plaintiff seeks damages, the plaintiff bears the burden of demonstrating entitlement to recover the amount of damages sought in the motion for default judgment.   *Wallace v. The Kiwi Grp., Inc.*, 247 F.R.D. 679, 681 (M.D. Fla. 2008).   Unlike well-pleaded allegations of fact, allegations relating to the amount of damages are not admitted by virtue of default; rather, the court must determine both the amount and character of damages to be awarded.   *Id.* (citing *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999)).   Ordinarily, unless a plaintiff's claim against a defaulting defendant is for a liquidated sum or one capable of mathematical calculation, the law requires the district court to hold an evidentiary hearing to fix the amount of damages.   *See Adolph Coors*, 777 F.2d at 1543–44.   However, "a hearing is not necessary if sufficient evidence is submitted to support the request for damages."   *Wallace*, 247 F.R.D. at 681.

## III.   FACTUAL ALLEGATIONS.

According to the complaint, Fernandez was the principal of two companies:   Kadaae, LLC ("Kadaae") and Kadaae Entertainment Corp. ("Kadaae Entertainment") (collectively the "Kadaae Companies"), both of which have since been administratively dissolved.   Doc. No. 1 ¶¶ 5, 7–8. Denizard was the principal of Ahead of the Game, LLC ("AOTG"), which company has likewise since been administratively dissolved.   *Id.* ¶¶ 6, 9.

Prior to 2015, Fernandez, through Kadaae, provided graphic design work to, and on occasion promoted concerts for, certain Latin artists at small Orlando-area venues.   *Id.* ¶ 13.   As a promoter, Fernandez would contract with and pay artists, bearing up front the costs of promoting and

producing the concert, including the costs of the venue.  *Id.*   In early 2015, Fernandez formed Kadaae Entertainment, and thereafter through the Kadaae Companies, started seeking money from investors, representing that the money would be used to fund major concert events.  *Id.* ¶ 14. Fernandez promoted the investment personally through word of mouth and through sales agents. *Id.*   Fernandez ultimately raised approximately $20.7 million from at least 56 investors.  *Id.*

Denizard was an early investor in the Kadaae Companies, and in 2015, he quit his job, formed AOTG, and began raising money for investment in the Kadaae Companies' concerts.  *Id.* ¶ 15.   Denizard ultimately raised approximately $10.4 million from at least 78 investors.  *Id.*

Most investors signed "Investor Agreements" with Kadaae or AOTG, which stated that the investment was for a "Business Venture" involving "music entertainment events."  *Id.* ¶ 16. Pursuant to the terms of the Investor Agreements, investors would receive their principal back and purported return on investment, some of which (many of the Kadaae investor agreements and all of the AOTG agreements) provided for a specific return by percentage.  *Id.*   The Investor Agreements provided that the investor could rollover the investment into another entertainment event in lieu of cashing out.  *Id.*   Pursuant to the Investor Agreements, the Kadaae Companies and AOTG were solely responsible for using the funds to further the venture; the investor's only obligation was to provide funds.  *Id.*

Some Kadaae investors also signed "Concert Partnership Agreements," through which "Kadaae and the investor would supposedly become partners in a Florida general partnership whose business would be 'the production or and participation in concert and other entertainment events.'" *Id.* ¶ 17.   Those agreements set forth the amount that Kadaae and the investor would make in "capital contributions," the name of the artists and venue involved, and the "net profit" the investor could expect to receive from the venture.  *Id.*   The agreements stated that the investor "shall have

no responsibility to carry out the business of the Partnership," and that investors who signed the agreement had no actual role in the business venture. *Id.* These purported general partnerships were not registered with the Florida Secretary of State. *Id.*

Defendants made material misrepresentations to investors and prospective investors regarding the Kadaae Companies' business and the use of investor funds, both orally and in writing, which were designed to give investors the impression that the Kadaae Companies would use investor money to produce and promote concerts for major recording artists such as Enrique Iglesias, Kanye West, and Pitbull. *Id.* ¶ 19. Specifically:

    a.  The Investor Agreements claimed that investor funds would be used for a "Business Venture" involving music entertainment events.

    b.  In many cases, Defendants, or a sales agent, would separately provide investors with the names of the artist and specific concert in which they would be investing.

    c.  Many of the Kadaae, and all of the AOTG, Investor Agreements set forth specific returns investors could expect to receive on the investment.

    d.  The Concert Partnership Agreements stated that "partnership capital" would be used for the concert at the venue set forth in the agreement, and that investors would receive the stated return on investment.

    e.  Fernandez distributed a marketing brochure to various investors that touted Kadaae Entertainment's control of production of a 2016 event called the Art of Rap Tour.  According to the brochure, the tour would consist of 21 shows across the United States featuring major artists such as Jay-Z, Snoop Dogg, and Kendrick Lamar that would generate a gross profit of over $20 million.

    f.  Fernandez and Denizard also provided investors with free tickets for the concerts they were supposedly investing in, telling one investor that Kadaae got the "free tickets" as part of its work in putting together the shows.

*Id*.  As an example:

[I]n October 2015, Defendants met with an individual identified herein as "Investor 1."  Defendants represented they had years of experience in the concert business, and that if Investor 1 invested in concerts they were promoting, he could expect returns of 30% to 50% within 60 to 90 days.  Fernandez claimed he worked closely

with the concert artists.   At the meeting, Defendants showed Investor 1 documents about the music industry and a poster of them posing with a well-known Mexican rock band, claiming they had organized concerts for that band.   Defendants represented that they were promoting two other concerts, for Ricky Martin and Alejandro Fernandez.   Defendants said that Investor 1 could expect a 40% return on investment in a matter of months if they invested in these concerts.

*Id.* ¶ 20.

Defendants knew that these representations were false.   *Id.* ¶ 21.   Although the Kadaae Companies promoted a handful of concert events for lesser-known artists at small venues in Orlando, Florida, they did not produce concerts for any major recording artists identified to investors and they had no involvement in the Art of Rap Tour.   *Id.*   Defendants also did not obtain the concert tickets given to investors by any association with the concert; rather they bought the tickets themselves.   *Id.*

Moreover, investor money was not spent on concerts as represented.   Only about $311,000 of the $20.7 million deposited into the Kadaae Companies' accounts was spent on concerts or related expenses, and no more than $327,000 in concert-related revenues were generated.   *Id.* ¶ 22. Fernandez, for his part, misappropriated at least $1.65 million in investor funds, and Fernandez also caused approximately $2.2 million to be paid to AOTG.   *Id.*   Fernandez used the bulk of the remaining funds to pay investors in "Ponzi scheme fashion" and to pay commissions to sales agents. *Id.*

Of $10.4 million in investor funds deposited into AOTG accounts, AOTG only transmitted approximately $1.9 million to the Kadaae Companies, and AOTG received back approximately $2.2 million.   *Id.* ¶ 23.   Denizard misappropriated at least $1.24 million in investor funds, and he used at least $6.58 million to make payments to investors in "Ponzi scheme fashion" and to pay commissions to sales agents.   *Id.*

- 8 -

On August 20, 2019, in a parallel criminal proceeding, this Court accepted Fernandez's guilty plea to twelve counts of wire fraud in connection with the scheme to defraud investors in the Kadaae Companies. *Id.* ¶ 5. *See United States v. Fernandez*, No. 6:19-cr-00008-GAP-GJK-1, Doc. No. 37 (M.D. Fla. Aug. 20, 2019). Approximately one month later, the SEC filed its complaint in this case. Doc. No. 1. On January 13, 2020, Fernandez was sentenced in his criminal case to, among other things, a term of 120 months of incarceration, to run concurrently on each of the twelve counts, and restitution in the amount of $14,976,724.00, to be disbursed to identified victims. Judgment was entered accordingly the following day. *See United States v. Fernandez*, No. 6:19-cr-00008-GAP-GJK-1, Doc. No. 60 (M.D. Fla. Jan. 14, 2020).[3]

## IV.   ANALYSIS.

The SEC seeks a final default judgment against Fernandez on all counts of the complaint, and the relief sought includes:   (1) imposition of a permanent injunction against Fernandez; and (2) an order that Fernandez pay disgorgement of $1,627,700 plus prejudgment interest of $192,596.28, for a total of $1,820,296.28, to be deemed offset by a restitution order entered against him in the parallel criminal proceeding. Doc. No. 39. The issues of liability and the relief sought will be addressed in turn.

### A.   Liability.

As discussed above, the complaint contains the following claims against Defendants: Violation of Sections 5(a) and 5(c) of the Securities Act (Count I); Violations of Sections 17(a)(1),

---

[3] According to the Court's docket, there is also a parallel criminal proceeding against Denizard. *See United States v. Denizard*, No. 6:20-cr-00135-PGB-EJK (M.D. Fla.). On October 19, 2020, the Court accepted Denizard's guilty plea to one count of conspiracy in connection with the scheme to defraud investors in the Kadaae Companies. *See id.* at Doc. Nos. 1, 23. Judgment as to Denizard's sentence was entered on February 22, 2021, which included 57 months of imprisonment, and $7,479,453.00 in restitution. *See id.* at Doc. No. 67.

17(a)(2), and 17(a)(3) of the Securities Act (Counts II–IV); and Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)–(c) promulgated thereunder (Counts V—VII).   Doc. No. 1, at 8–11.

    *1. Sections 5(a) and 5(c) of the Securities Act (Count I).*

   Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), prohibit "use of any means or instruments of transportation or communication in interstate commerce" to offer or sell securities without filing an effective registration statement with the SEC or qualifying for an exemption from the registration requirement.   "To establish a prima facie case of violation of section 5, a plaintiff need allege only the sale or offer to sell securities, the absence of a registration statement covering the securities, and the use of the mails or facilities of interstate commerce in connection with the sale or offer."   *Raiford v. Buslease, Inc.*, 825 F.2d 351, 354 (11th Cir. 1987) (citing *Swenson v. Engelstad*, 626 F.2d 421, 424–25 (5th Cir. 1980)).

   The SEC alleged in its complaint the sale of securities, *see* Doc. No. 1 ¶ 18,[4] the absence of a registration statement filed with the SEC and that no exemption from registration existed, *see id.* ¶¶ 1, 25, and the use of the mails or facilities of interstate commerce in connection with the conduct alleged in the complaint, *see id.* ¶ 12.[5]   *See also id.* ¶¶ 24–27.   Accordingly, the SEC has adequately alleged that Fernandez violated Sections 5(a) and 5(c) of the Securities Act.

---

[4] *See also* pp. 14–15 *infra*.

[5] As the SEC points out, (*see* Doc. No. 39, at 14), because Fernandez pleaded guilty to wire fraud in the parallel criminal proceedings, he would have admitted to "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."   *See* 18 U.S.C. § 1343.

2.      *Sections 17(a) of the Securities Act & Section 10(b) of the Exchange Act*

*(Counts II-VII)*

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, all proscribe fraudulent conduct in the offer or sale of securities.   Section 17(a) of the Securities Act provides that:

It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).   "Section 10(b) of the Securities Exchange Act makes it 'unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.'"   *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002) (alternations in original) (quoting 15 U.S.C. § 78j).   Rule 10b-5 implements this provision and forbids the use of "any device, scheme, or artifice to defraud" or any other act that operates as a fraud or deceit.   17 C.F.R. § 240.10b-5(a), (c).   Rule 10b-5 also proscribes the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."   *Id.* § 240.10b-5(b).

Thus, "[t]o state a claim for securities fraud under Section 10(b), a plaintiff must allege that the defendant made material misstatements or omissions as to which he had a duty to speak, or used

a fraudulent device, with scienter, in connection with the purchase or sale of securities." *S.E.C. v. Wall St. Commc'ns, Inc.*, No. 8:09-cv-1046-T-30TGW, 2009 WL 2579310, at \*3 (M.D. Fla. Aug. 19, 2009) (citations omitted). "A claim under Section 17(a) of the Securities Act requires essentially the same elements as a claim under Section 10(b) and Rule 10b–5, except that there is no scienter requirement for claims under Section 17(a)(2) or (3)." *Id.* (citing *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)).

Here, the complaint alleges that Fernandez made false statements to investors regarding the use of investor funds in producing and promoting alleged concert events. Doc. No. 1 ¶¶ 3, 19–23. Specifically, Fernandez made false statements to investors regarding the Kadaae Companies' business and the use of investor funds, misrepresentations which were designed to give investors the impression that the Kadaae Companies would use investor funds to produce and promote concerts for major recording artists and particular concert tours. *Id.* These representations also promised gross profits in the tens of millions of dollars, with expected returns on investments of 30% to 50% within a short time period. *Id.* However, in reality Fernandez did not produce concerts for any major recording artists, he was not involved in the particular concert tour as touted, nor were the investor funds spent on concerts as represented. *Id.* Thus, the SEC has sufficiently alleged the falsity of the representations.

To determine whether these false statements were material, the Court considers "whether there is a substantial likelihood that a reasonable investor would consider the omitted facts or misrepresentations important in deciding whether to invest." *Currie v. Cayman Res. Corp.*, 835 F.2d 780, 783 (11th Cir. 1988) (citations omitted). In addition to the misrepresentations listed above, the complaint alleges that of the $20.7 million of investor funds deposited into the Kadaae Companies' accounts, only about $311,000 was actually spent on concerts or related expenses, no

more than $327,000 in concert-related revenues were generated, Fernandez misappropriated at least $1.65 million in investor funds, and the remaining funds were used to make payments to other investors and to pay commissions to sales agents.   Doc. No. 1 ¶¶ 21–22.   Moreover, the investor funds were not used to produce or promote concerts for major recording artists as represented.   *Id.* ¶¶ 19–22.   Upon consideration, there is a substantial likelihood that the misrepresentations would significantly influence whether an investor chose to invest money with the Kadaae Companies.   Therefore, these misrepresentations are material.   *See, e.g.*, *S.E.C. v. Coplan*, No. 13-62127-CIV, 2014 WL 695393, at *4 (S.D. Fla. Feb. 24, 2014) (finding materiality where "a substantial likelihood exists that a reasonable investor considering whether to invest would have wanted to know that [the defendant] (1) used investors' funds to pay earlier investors their purported returns; (2) misappropriated investors' funds for personal use; (3) never invested any of the investors' contributions . . .; and (4) provided false financial statements").

The SEC must also show that Fernandez acted with scienter, which is an "intent to deceive, manipulate, or defraud."   *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).   "Scienter may be established by a showing of knowing misconduct or severe recklessness."   *S.E.C. v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982).   Recklessness requires a showing that the conduct at issue was "an extreme departure of the standards of ordinary care" that presented "a danger of misleading buyers or sellers that either was known to the defendant or is so obvious that the actor must have been aware of it."   *Id.* (quoting *Sec. & Exch. Comm'n v. S.w. Coal & Energy Co.*, 624 F.2d 1312, 1321 (5th Cir. 1980)).   In the complaint, the SEC alleges that Fernandez knew that the representations made regarding the Kadaae Companies were false with regard to the use of investor funds, and that Fernandez engaged in a Ponzi-type scheme with the investor funds.   Doc. No. 1 ¶¶ 21–22.   Thus, the SEC has properly alleged that Fernandez acted with scienter.   *See, e.g.*, *Coplan*,

2014 WL 695393, at *4 (requisite scienter admitted by virtue of default judgment based on false misrepresentations and omissions by the defendant where the defendant made no investments as represented, retained investor funds, and engaged in Ponzi-scheme payments to investors).

To determine whether these actions occurred "in connection with" the purchase or sale of securities, the SEC need only show "a fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide." *Zandford,* 535 U.S. at 825.   This standard is to be interpreted flexibly to effect the purposes of the statute. *Id.   See also Coplan,* 2014 WL 695393, at *5 (citation and internal quotation marks omitted) ("[W]henever assertions are made . . . in a manner reasonably calculated to influence the investing public, the 'in connection with' requirement is satisfied.").

Here, the SEC alleged in the complaint that the "Investor Agreements" and "Concert Partnership Agreements" are "investment contracts" within the meaning of the Securities Act and the Exchange Act, rendering them securities for purposes of same.   Doc. No. 1 ¶ 18.   The SEC asserts the same in its motion for default judgment.   Doc. No. 39, at 12–13.

An "investment contract" has three elements:   "(1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others."   *S.E.C. v. Unique Fin. Concepts, Inc*., 196 F.3d 1195, 1199 (11th Cir. 1999) (quoting *Villeneuve v. Advanced Business Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir. 1983), and discussing *S.E.C. v. W.J. Howey Co*., 328 U.S. 293, 298–99 (1946)).   Here, the scheme perpetrated by Fernandez through the Kadaae Companies meets each of these elements.   First, money was invested through the "Investor Agreements" and "Concert Partnership Agreements."   Second, the investment of money was in a common enterprise because, as the SEC alleges, "the fortunes of all investors [were] inextricably tied to the efficacy of" Fernandez's success in promoting concerts.   Doc. No. 39, at 13 (citing *Unique Financial Concepts, Inc*., 196 F.3d at 1199).   Third, the complaint alleges that under

- 14 -

the agreements, the Kadaae Companies and AOTG were solely responsible for furthering the venture, while the investor's only obligation was to provide funds.  Doc. No. 1 ¶ 16.  For these reasons, the SEC has adequately alleged that the investments at issue were securities.  *See Coplan*, 2014 WL 695393, at *2, 5 (investment scheme constituted offer of sale and securities where the defendant solicited funds from investors for investment in immigration bail bonds, promising high rates of return, and the defendant executed investment contracts with investors); *S.E.C. v. Utsick*, No. 06-20975-CIV, 2009 WL 1404726, at *1 (S.D. Fla. May 19, 2009) (the defendant's offer and sale of securities included "loan agreements and units of various limited liability companies, to finance the production and promotion of rock concerts, tours, and other events and enterprises of a similar nature and related thereto"), *aff'd*, 373 F. App'x 924 (11th Cir. 2010).  *See also Sec. & Exch. Comm'n v. Tropikgadget FZE.*, No. 15-CV-10543-ADB, 2016 WL 4582248, at *4 (D. Mass. Aug. 31, 2016) (finding promotional Ponzi scheme constituted security for purposes of Securities Act).   Further, the scheme outlined in this Report demonstrates that it was "in connection with" the purchase or sale of such securities/investment contracts.

Consequently, the allegations of the complaint, deemed admitted by Fernandez, establish that Fernandez violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and thus, the SEC is entitled to a default judgment against Fernandez for these violations.

B.     Injunctive Relief.

The SEC requests permanent injunctive relief enjoining Fernandez from future violations of the Securities Act and the Exchange Act.  "The SEC is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated."  *S.E.C. v. Calvo*, 378 F.3d 1211, 1216 (11th

Cir. 2004) (per curiam) (citing *Unique Fin. Concepts, Inc.*, 196 F.3d at 1199 n.2).    As discussed

above, the SEC has adequately alleged a prima facie case that Fernandez violated the securities laws.

To determine if the wrongful actions are likely to be repeated, the Court considers several

factors, including the "egregiousness of the defendant's actions, the isolated or recurrent nature of

the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against

future violations, the defendant's recognition of the wrongful nature of his conduct, and the

likelihood that the defendant's occupation will present opportunities for future violations."

*Carriba Air*, 681 F.2d at 1322 (quoting *Sec. & Exch. Comm'n v. Blatt*, 583 F.2d 1325, 1334 n.29

(5th Cir. 1978)).   In the motion for default judgment, the SEC argues:

> As for the first three factors, Fernandez engaged in egregious, repetitive behavior
> involving an extremely high level of scienter.   Over a two-year period, he
> fraudulently raised more than $20 million from over 50 investors for the purpose of
> obtaining money for personal use and to make Ponzi payments that helped conceal
> and extend the fraud.
>
> As to the fourth and fifth factors, Fernandez has pleaded guilty in a related criminal
> matter, and he has chosen not to defend this lawsuit.   With respect to the final factor,
> although the Commission does not have information regarding Fernandez's
> employment, he committed the fraud in question while self-employed and could do
> so again.   Therefore, the Court cannot have any assurances that Fernandez will avoid
> future misconduct.   While Fernandez's guilty plea weighs in his favor, the
> Commission submits this is outweighed by the other factors and warrants the Court
> entering a permanent injunction against him.

Doc. No. 39, at 16–17.   Upon consideration, the undersigned agrees with the SEC that these factors

weigh in favor of granting injunctive relief.

The SEC attached to its motion for default judgment a proposed order which contains "obey

the law" language as it relates to future violations of Section 10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder, and Sections 5 and 17(a) of the Securities Act.   Doc. No. 39-6, at

3–7.

Generally, injunctions which merely require defendants to "obey the law" do not meet the specificity requirements of Federal Rule of Civil Procedure 65(d).  *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1200–01 (11th Cir. 1999).   However, "Congress specifically authorized an injunction to issue to prohibit the violation of the securities laws."  *Carriba Air*, 681 F.2d at 1321. *See* 15 U.S.C. § 77t ("Whenever it shall appear to the Commission that any person is engaged in or about to engage in acts of practices which constitute or will constitute a violation of the provisions of this subchapter . . . the Commission may, in its discretion, bring an action . . . to enjoin such acts or practices.").

Accordingly, I will respectfully recommend that the Court enter a permanent injunction against Fernandez as outlined in the proposed order.  *See* Doc. No. 39-6, at 3–7.[6]  *See also U.S. S.E.C. v. Ginsburg*, 362 F.3d 1292, 1305 (11th Cir. 2004) (finding clear error where district court did not enjoin the defendant "to refrain from violating the securities laws in the future").

C.     Disgorgement & Prejudgment Interest.

The SEC requests an order of disgorgement against Fernandez in the amount of $1,627,700, along with an award of prejudgment interest.   Doc. No. 39, at 1, 17–20.  *See also* Doc. No. 39-6, at 7.

"The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains."  *Calvo*, 378 F.3d at 1217.   "[E]xactitude is not a requirement." *S.E.C. v. Monterosso*, 756 F.3d 1326, 1337 (11th Cir. 2014) (quoting *S.E.C. v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005)).   "Once the SEC has produced a reasonable approximation of

---

[6] I note that the language in the proposed order as to the permanent injunction is substantially the same as the language the Court previously approved and entered against Denizard.  *Compare* Doc. No. 39-6, at 3–7, *with* Doc. No. 35, at 2–6.

the defendant's unlawfully acquired assets, the burden shifts to the defendant to demonstrate the SEC's estimate is not reasonable." *Id.* (citing *Calvo*, 378 F.3d at 1217).

Here, the SEC estimates the disgorgement calculated as follows:

| Decl. ¶ | Brief Description | Amount |
|---|---|---|
| 10a | Checks to Fernandez | $1,950,000 |
| 10b | Withdrawals | 1,290,000 |
| 10c | Net Transfers to Fernandez | 200,000 |
| 11 | Other Payments | 377,000 |
| 9a | Less: Cash Deposits | (1,890,000) |
| 9b | Less: Cashier's Checks - Fernandez | (277,000) |
| 12 | Less: Portion of Other Payments from Account ending 6666 | (22,300) |
| | | **$1,627,700** |

Doc. No. 39, at 18.   The SEC submits the declaration of Lina Fernandez ("Lina")[7] in support of its request for disgorgement.   Doc. No. 39-1.   Lina is a Senior Accountant with the Miami Regional Office of the SEC.   *Id.* ¶ 2.   Lina's declaration is based on her "review of bank records, including signature cards, monthly statements, canceled checks, cashier's checks, deposits, and wires" for certain Kadaae bank accounts.   *Id.* at 1–2 ¶ 5.   Based on a review of the Kadaae bank accounts, Lina avers as follows:

> 7.   The Kadaae Bank Accounts held a combined total of $23.7 million in deposits between January 2015 and May 2017, excluding transfers between these accounts.
>
> 8.   Of [these] deposits, the Kadaae Bank Accounts received approximately $20.7 million between January 2015 and March 2017 of what appears to be investor funds from investors and sales agents that solicited investors ["Investor Funds."]
>
> 9.   The deposits described . . . also included the following:

---

[7] To avoid confusion, given that Defendant's surname is also Fernandez, this Report will refer to the declarant as "Lina."

a.  $1.89 million from cash deposits between January 2015 and February 2017 in the bank accounts where Andres Fernandez was the sole signatory; and

b.  $277,000 from cashier's checks with notations indicating that Andres Fernandez was the remitter of the checks.

10.   Between January 2015 and May 2017, Andres Fernandez received at least $3.44 million from the Kadaae Bank Accounts, including the following:

a.  $1.95 million in checks payable to Andres Fernandez between January 2015 and February 2016;

b.  $1.29 million in withdrawals between January 2015 and May 2017 from bank accounts where Andres Fernandez was the sole signatory; and

c.  $200,000 from net transfers out between January 2015 and February 2016 to two personal accounts at JPMorgan Chase Bank under the names Andres Fernandez.

11.   Between January 2015 and May 2017, the Kadaae Bank Accounts were also used to pay for, among other things, the following amounts totaling approximately $377,000:

a.  $191,000 to entities that appear to provide travel related services, including Avianca, Bellagio Hotel Casino, Delta Air, Fountainbleau Resort, Hilton Hotels Disney, Jetblue, and The Ritz Carlton;

b.  $66,900 to various merchants, including Best Buy, Gucci, Ikea, Chuck E Cheese, Disney, and Toys R Us;

c.  $31,000 for what appears to be rent based on notations on some of the checks;

d. $27,800 to ADT Security, Bright House Networks, Duke Energy, and Orange County Utilities;

e. $18,200 to entities that appear to provide financial services, including Capital One Bank and Regional Acceptance;

f.  $14,000 to entities that appear to be restaurants and dining, including Don Julio Mexican Grill, Jimmy S Fish House, Komodo, Longhorn Steak, Prime 112, and Wynwood Kitchen;

g.  $11,000 to Paypal;

    h.   $4,600 to Best Luxury Trans;

    i.   $3,500 to IRS USA Tax;

    j.   $3,300 to Dis Wdw Pass and WDW Disney Tickets;

    k.   $3,100 to entities that appear to be gas stations; and

    l.   $2,600 to Cricket Wireless and Net10 Services.

12.   The TD Bank account . . . was used to pay for $33,500 of the payments discussed in paragraph 11.  Andres Fernandez . . . withdrew $11,200 to purchase cashier's checks to pay for amounts included in the $33,500.

Doc. No. 39-1 ¶¶ 7–12.   Based on these averments, the SEC has provided a reasonable approximation of the ill-gotten gains, and has sufficiently demonstrated that Fernandez should be required to disgorge the total amount of misappropriated funds—$3,817,000—less the amount returned/deposited by Fernandez—$2,189,300—for a total disgorgement amount of $1,627,700. *See, e.g.*, *S.E.C. v. GMC Holding Corp.*, No. 6:08-cv-275-Orl-28KRS, 2009 WL 506872, at *6 (M.D. Fla. Feb. 27, 2009) (declaration submitted by SEC sufficient to establish total amount of disgorgement).

In the motion for default judgment, the SEC also seeks prejudgment interest, calculated from September 1, 2017 through December 31, 2019, for a total amount of prejudgment interest of $192,596.28.   Doc. No. 39, at 19.   *See also* Doc. No. 39-4.   The SEC calculated prejudgment interest using the IRS underpayment rate.   *See* Doc. No. 39, at 19 ("In Commission cases, prejudgment interest on disgorgement amounts generally is calculated based on the IRS underpayment rate, *i.e.*, the delinquent tax rate as established by the Internal Revenue Service, IRC § 6621(a)(2), and assessed on a quarterly basis.").   *See also* Doc. No. 39-4.

"Prejudgment interest is imposed, in the discretion of the trial court, to divest those found liable under the securities laws of any benefit accrued from the use of the ill-gotten gain." *S.E.C. v. Yun*, 148 F. Supp. 2d 1287, 1293 (M.D. Fla. 2001). "The time frame for the imposition of prejudgment interest usually begins with the date of the unlawful gain and ends at the entry of judgment." *Id.*

Upon consideration, the undersigned finds that prejudgment interest should be awarded in this case in order to divest Fernandez "of any benefit that has accrued from the use of the ill-gotten gain." *See U.S. S.E.C. v. Aleksey*, No. 8:07-cv-159-T-24-MAP, 2007 WL 1789113, at *2 (M.D. Fla. June 19, 2007). With respect to the date range to be used to calculate prejudgment interest, the SEC has not established the precise dates on which Fernandez acquired the funds to be disgorged. Rather, the SEC points to the Notice of Maximum Penalties, Elements of Offense, and Factual Basis in the parallel criminal proceeding against Fernandez, which states that the scheme described herein lasted "from at least . . . October 2015" and continued to "in or about September 2017." *See* Doc. No. 39, at 19 (citing to *United States v. Fernandez*, No. 6:19-cr-00008-GAP-GJK-1, Doc. No. 29).[8] I find that October 1, 2017 is an appropriate starting point, as the monies were fraudulently obtained at some point before the scheme came to a conclusion no later than the end of September 2017.[9]

---

[8] Fernandez thereafter pleaded guilty to the charges. *See id.* at Doc. Nos. 30, 33, 37.

[9] The SEC identifies September 1, 2017 as the starting date in its motion. Doc. No. 39, at 19. However, the undersigned believes that this is a typographical error for two reasons. First, the Notice of Maximum Penalties, Element of Offense, and Factual Basis lists the end date for the fraudulent scheme as "in or about September 2017." Thus, it would be reasonable to presume that Fernandez would have fraudulently obtained monies no later than the end of the month, and the SEC has presented no evidence to suggest that a September 1, 2017 date should be utilized instead. Second, and perhaps more convincing on this point, the Prejudgment Interest Report submitted in support of the prejudgment interest calculations utilizes a starting date of October 1, 2017. *See* Doc. No. 39-4. The Report calculates interest by quarter (the date column is entitled "Quarter Range"), and October 1, 2017 would be the first day of the first quarter following the conclusion of the fraudulent scheme.

As to the December 31, 2019 end date for the calculation of pre-judgment interest, the SEC again relies upon the parallel criminal proceeding, specifically the judgment issued on January 14, 2020.   *See* Doc. No. 39, at 19 (citing to *United States v. Fernandez*, No. 6:19-cr-00008-GAP-GJK-1, Doc. No. 60).   It is not clear why the SEC chose this end date, as opposed to the date judgment is entered in this case.   However, the imposition of prejudgment interest is discretionary, and the SEC bears the burden of presenting evidence to support its request for damages, including prejudgment interest.   *See Wallace*, 247 F.R.D. at 681.   Therefore, in the absence of any evidence to support any additional amount of prejudgment interest, the undersigned will also recommend that the end date of December 31, 2019 be utilized for the calculation and award of prejudgment interest.

The undersigned also finds that the SEC properly utilized the IRS underpayment rate, and that the SEC's calculations are appropriate.   *See S.E.C. v. Lauer*, 478 F. App'x 550, 558 (11th Cir. 2012) ("[T]he district court did not abuse its discretion by applying the commonly-used IRS underpayment rate."); *Sec. & Exch. Comm'n v. Martin*, No. 6:17-cv-1385-Orl-37GJK, 2019 WL 1649948, at *3 (M.D. Fla. Apr. 1, 2019) ("Courts have, without controversy, used the IRS underpayment rate as the proper measure of prejudgment interest."), *report and recommendation adopted*, 2019 WL 1643203 (M.D. Fla. Apr. 16, 2019).

D.   Offset.

The SEC requests that the total award against Fernandez of $1,820,296.28, which includes the amount in disgorgement and prejudgment interest, be offset by the restitution order entered against Fernandez in the parallel criminal proceedings because the amount of restitution ordered in the criminal proceedings exceeds and includes the amounts at issue in this case.   Doc. No. 39, at 1, 20.   *See also* Doc. No. 39-6, at 7.

- 22 -

Upon review, the undersigned finds the request appropriate.  *See, e.g.*, *Sec. & Exch. Comm'n v. Monterosso*, No. 07-61693-CV, 2012 WL 12948750, at *4 (S.D. Fla. Oct. 17, 2012) (disgorgement properly offset by "any amounts in restitution already tendered" in parallel criminal proceeding); *see also S.E.C. v. Palmisano*, 135 F.3d 860, 863 (2d Cir. 1998) (ordering that restitution ordered in a criminal judgment should be offset by disgorgement order in parallel civil proceeding; possibility existed that the total amount the defendant was required to pay in restitution and disgorgement could exceed the unlawful gains).

    E.    <u>Civil Penalty</u>.

Although in the complaint the SEC seeks a civil penalty against Fernandez, by its motion for default judgment, the SEC seeks to dismiss the civil penalty claim with prejudice, or alternatively, asks that the Court deem the request abandoned and that the motion for default judgment otherwise resolves the SEC's claims against Fernandez in entirety.   Doc. No. 39, at 20–21.   Upon review, the undersigned respectfully recommends that the Court treat the claim for civil penalty as abandoned, and dismiss the claim for civil monetary penalty against Fernandez.  *See, e.g.*, *S.E.C. v. Barriermed, Inc.*, No. 6:09-cv-102-Orl-28KRS, 2010 WL 4056021 (M.D. Fla. Sept. 24, 2010) (recommending dismissal of civil penalty claim on default judgment when SEC filed notice of intent to dismiss claim), *report and recommendation adopted*, 2010 WL 4053790 (M.D. Fla. Oct. 14, 2010).

    F.    <u>Retention of Jurisdiction</u>.

In the proposed order, the SEC requests that the Court retain jurisdiction over this matter as follows:

> "[T]his Court shall retain jurisdiction over this matter and Fernandez in order to implement and carry out the terms of all Orders and Decrees that may be entered and/or to entertain any suitable application or motion for additional relief within the

jurisdiction of this Court, and will order other relief that this Court deems appropriate under the circumstances.

Doc. No. 39-6, at 8.   The SEC does not discuss this request in its motion, or otherwise provide any authority in support.   *See* Doc. No. 39.   However, the Court found it appropriate to retain jurisdiction to enforce the judgment of permanent injunction against Denizard.   *See* Doc. No. 35, at 7.   Accordingly, the undersigned will respectfully recommend that the Court do the same with regard to the judgment against Fernandez.   *See also S.E.C. v. Bridge*, No. 3:13-cv-668-J-32MCR, 2014 WL 169813, at *1 (M.D. Fla. Jan. 10, 2014) (retaining jurisdiction after entry of default judgment "as necessary to enforce [the] Order").

## V.     RECOMMENDATION.

For the reasons discussed herein, it is **RESPECTFULLY RECOMMENDED** that the Court:

1.   **GRANT** Plaintiff's Renewed Motion for Final Default Judgment Against Defendant Andres Fernandez (Doc. No. 39) as outlined herein;

2.   **ENTER** a permanent injunction against Fernandez as requested by the SEC, *see* Doc. No. 39-6, at 3–7;

3.   **ORDER** that Fernandez is liable for disgorgement in the amount of $1,627,700, as well as prejudgment interest of $192,596.28, which Order shall be offset by the restitution award in the parallel criminal proceedings, *see United States v. Fernandez*, No. 6:19-cr-00008-GAP-GJK-1, Doc. No. 60 (M.D. Fla. Jan. 14, 2020).

4.   **DISMISS** the SEC's claim for a civil monetary penalty against Fernandez, *see* Doc. No. 1, at 12; and

5.   **RETAIN** jurisdiction over this matter as necessary to enforce this Order.

## <u>NOTICE TO PARTIES</u>

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on June 21, 2021.

LESLIE R. HOFFMAN
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party